(No. 32625. ▮▮▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN W. MOLZ, Plaintiff in Error.

*Opinion filed June 26, 1953.*

ELDON E. HAZLET, of Carlyle, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOSEPH B. SCHLARMAN, State's Attorney, of Carlyle, for the People.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

The plaintiff in error, John W. Molz, hereinafter designated defendant, has sued out this writ of error to review the judgment of the circuit court of Clinton County sentencing him, on a plea of guilty to armed robbery, to a minimum term of ten years and a maximum term of twenty

years. Error is assigned on the trial court's treatment of his application for probation.

On January 15, 1952, the defendant and his nephew and codefendant were arrested at their homes in Salem, by the sheriff of Clinton County, accompanied by the sheriff of Marion County, and were taken to the Clinton County jail. Subsequently, both defendant and his co-defendant signed confessions admitting the armed robbery of one Edward Hoffman, proprietor of a filling station at Beckemeyer, on the night of January 14, 1952. Defendant's confession, although not admitted in evidence, was recited in counsel's arguments and is set out in full in his brief and argument. This confession stated that when defendant returned from his work at United Contracting Company, Salem, about 4:30 or 5:00 P.M. June 14, his nephew and codefendant, Alva Wayne Letsinger, was at his home; that his nephew, whom he called Wayne, had not had steady work, told him he needed money and said, "How about pulling a job tonight—I said no;" that Wayne suggested they meet at "Joe's" tavern after supper; that after supper he and his wife went to the tavern, about 8:00 P.M. he drove his wife home, procured a 22-calibre pistol which he placed in the glove compartment of the car, and returned to the tavern and met Wayne. They had several drinks together and then drove to Beckemeyer, arriving there about 10:00 P.M.; that on the way there Wayne again said he needed money and suggested they hold up someone. Upon arriving in Beckemeyer, they parked at a tavern, sat in the car talking about what job to do and defendant stated he "tried to talk him out of doing any." Defendant then went into a tavern, had a couple of drinks, and when he returned to the car Wayne suggested they hold up the "Phillips 66" station. Defendant took the pistol from the glove compartment, put it in his overall bib, and drove up to that station just as it was closing. They drove past the "Shell" filling station, operated by

Edward Hoffman, noted that he was alone, turned around and drove back there, parked the car between the building and the pumps. From this point we quote defendant's confession, as it appears in his brief and argument filed in this court: "Wayne and I went into the station and Edward Hoffman was in there. I walked first and Wayne was behind me. I had my 22 pistol in my overall bib. We walked in the door and I asked Hoffman if he had any coffee. He said no but that we could get some down at the tavern as they served it. I started back to the door and Wayne punched me with his elbow. I pulled out my 22 pistol and turned around and said to Hoffman, 'this is a hold up.' Hoffman backed up and pulled a pistol out of his pocket. Then Wayne ran toward Hoffman and clinched him. He grabbed the arm of Hoffman in which he had the gun and also held his arms. They scuffled and Hoffman's gun went off. I went in behind Wayne and grabbed Hoffman's arm that he had the gun in and Wayne grabbed Hoffman's gun. Then Hoffman said, 'he's got my gun.' I turned him loose and he grabbed at my gun and then ran out the front door. When he got outside he hollered 'help' several times. We ran out the front door, got into our car and drove off. We drove to Self's tavern in Wamac, south of Centralia. Got there about 11:30 or 12:00 that night. We stayed there only a few minutes. Then we drove back to Salem. I drove to my home. Wayne got out there and walked home from there. He took Hoffman's 38 pistol with him. My Dodge sedan has reflector shields over the headlights. Dated this 18th day of January, 1952."

The record discloses that Edward Hoffman, then 70 years of age, died of a heart attack at his home at 1:30 A.M. the following morning. No evidence was adduced, however, to attribute the death to the robbery.

On March 28, 1952, the Clinton County grand jury returned a true bill of indictment charging defendant and

his codefendant with armed robbery. Upon arraignment on the same day they were furnished with copies of the indictment, lists of witnesses and jurors, and at 12:15 P.M., they advised the court they wished to plead guilty. The court refused to accept their pleas, appointed counsel for them and recessed to 1:30 P.M. At that time they appeared with their appointed counsel, and, being questioned by the court, advised him they had conferred with their counsel and wanted to enter their pleas of guilty. The court thereupon advised them of their right to trial by jury and admonished them as to the consequences of their pleas; they persisted therein and the court accepted their pleas and adjudged them guilty of armed robbery as charged in the indictment. Defendants' counsel stated that they wished to make application for probation, and the court stated "They have that right, and their cases will be referred to the probation officer for investigation and report."

On April 18, 1952, the probation officer filed a report in the office of the circuit clerk of Clinton County. This report stated that the probation officer had letters from the sheriff of Marion County, defendant's employer, and a fellow worker, all attesting defendant's good conduct in Illinois; also letters from a former associate judge and defendant's family doctor from Reed Springs, Missouri, defendant's former home. The report further showed defendant had been married ten years, had a wife and three small children whom he had always supported. The report also stated that the officer had talked with citizens of Beckemeyer, including members of deceased's family, and that they opposed probation. Accompanying the report was a letter from a police judge with a petition for the allowance of probation signed by 84 citizens of Stone County, Missouri, attesting to the excellent reputation of defendant and his parents as upright, law-abiding citizens.

On April 22, 1952, the defendants appeared in court with their counsel and the State's Attorney, and the following hearing was had. The court stated he had received the reports of the probation officer and asked the State's Attorney if he had anything to say. The State's Attorney then stated that he opposed probation for either of the defendants, recited the details of the crime and argued against any leniency being extended to them. Counsel for defendants thereupon argued to the court what he deemed to be the extenuating circumstances of the offense, emphasizing the previous good record of the defendant, and asked for probation for both defendants. Upon the conclusion of counsel's statement, the court asked each defendant if he had anything to say and each replied in the negative. The court then asked them to stand up and stated: "It isn't a question of vengeance; it's a question of what's for the public good. I can't see that it would be for the public good if a crime of this kind should go unpunished. It works a hardship on the family, but you knew you had your family. It's unfortunate that they be made to suffer, but you are the men who committed the crime, and if every man who committed a crime were released or released on probation simply because he had a family there would be no punishment." Then followed the pronouncement of sentence as to each defendant.

We have recited the circumstances of this offense, the probation officer's report, and the procedure in some detail because defendant's contention that "The court, the State's Attorney and the probation officer have treated this petition with a lightness and carelessness bordering on complete contempt and disregard for the wishes of the legislature and the rights of the accused," focuses our attention upon those details.

Defendant's specific contentions can be consolidated into four objections, (1) the order referring the applica-

tion for probation to the probation officer did not comply with the statute in that it failed to direct the officer what to do; (2) the court failed to enter an order denying the application for probation before passing sentence; (3) the probation officer's report does not show that a proper investigation was made and does not contain the facts required by the Probation Act, and (4) the defendant has been deprived of due process in that he had no notice of the hearing on his application for probation, he was not furnished a copy of the probation officer's report, had no notice of its filing, and was deprived of an opportunity to prepare and present his case.

A just, fair and legal determination of the specific complaints of defendant requires, first, that we consider the fundamental principles underlying and giving rise to the theory of suspended sentences, now regulated by our probation systems. Constitutionally, there is no right to probation. After a plea of guilty a prisoner "stands convicted, he faces punishment, he cannot insist on terms or strike a bargain." (*Burns* v. *United States*, 287 U.S. 216; 53 S. Ct. 154). As a matter of constitutional rights, therefore, the rule of "strict law" which demanded fixed punishment for a crime according to its classification was perfectly justified and not objectionable. A trend away from this strict rule developed, not from any rights vested in the individual, but from the idea that society might be benefited by vesting in a judge, a probation officer or some authority, discretion to adjust the penalty to the individual and to the circumstances of the offense. This system is known to the criminologists as "individualization of punishment." Its real purpose is not to deal sympathetically or charitably with the individual but in the theory that by benefiting the particular individual, society will be the real beneficiary in that the individual will become a useful member of society rather than an habitual criminal and a menace and burden as a chronic offender. (C.J.S.,

Criminal Law, sec. 1618.) All our probation systems are based on these principles and our statutes must therefore be read, interpreted and applied to accomplish the purpose for which they are intended.

The first rule of law, then, is that the granting or refusing of an application for probation generally rests within the sound discretion of the court, this discretion to be exercised primarily for the benefit of society, and only incidentally for the benefit of the accused. (*People* v. *Miller*, 317 Ill. 33, 38; *People* v. *Bonheim*, 307 Ill. 316; *People ex rel. Barrett* v. *Bardens*, 394 Ill. 511.) Our reports are replete with statements by this court that this discretion is not even reviewable. (*People* v. *Syer*, 400 Ill. 444; *People* v. *Denning*, 372 Ill. 549; *People* v. *Racine*, 362 Ill. 602; *People* v. *Wheeler*, 349 Ill. 230.) The only modification or relaxation of this rule which we have been able to find in this State appears in *People* v. *Donovan*, 376 Ill. 602. In that case the defendant asked to be released on probation, the court heard the statements of the prosecution in regard to the defendant's admissions of the commission of the offense, and summarily denied probation, knowing nothing and making no inquiry of any kind about the defendant or the circumstances of the offense. We there said, at page 606, "It is obvious that where the facts are not shown and are not inquired into, the denial of probation is an arbitrary and unauthorized exercise of the power."

In *People* v. *Hughes*, 386 Ill. 414, wherein defendant objected to the court's failure to hear evidence in mitigation or aggravation, as required by statute, before passing sentence, we held that the record need not show the evidence heard by the court, that such evidence need not be preserved or that the court make any special findings on the evidence. We further there said that the burden of showing the illegality of the proceeding rests upon a defendant seeking reversal of the judgment.

We conclude therefore that denial of an application for probation, after a hearing in substantial compliance with the statute, cannot be set aside by this court unless the defendant affirmatively shows the trial court's decision was purely arbitrary.

The record in the instant case does not meet this test. This record discloses that defendant's application for probation was referred to the probation officer for investigation and report; that that officer did investigate defendant's past record and his status as a law-abiding citizen, his home life and his reputation, and that report included every fact or circumstance favorable to the defendant, including the opinions and recommendations of his and his family's acquaintances and friends. The record further shows that this report was before the court at the hearing, that the court was fully informed by counsel for defendant as well as counsel for the people as to all the circumstances of the offense, as to all extenuating circumstances in behalf of defendant that his counsel desired to present, and that defendant himself was given ample opportunity to present anything further he might wish before the court ruled on his application, and he stated to the court there was nothing further. The court was fully advised as to all the matters which should be taken into consideration in exercising his discretion in granting or denying probation, especially as to all matters which the defendant desired to present, and we are, therefore, unable to find that the court's ruling was arbitrary or that he did not know, and made no effort to inquire into, the circumstances as required by statute.

Defendant's objections as to the failure of the court or the clerk to enter a formal order specifically commanding the probation officer as to what should be done in the investigation and report, or the failure of the court to either orally or by the entry of an order deny the application for probation, cannot justify reversing the trial court's

judgment. The statute itself advises the probation officer what he must do when the application is referred to him and this record shows that the probation officer substantially complied with that statute. (*People* v. *Miller,* 317 Ill. 33.) The act of the court in sentencing the defendant on his plea is a sufficient denial of the application for probation and no formal denial is deemed necessary. The defendant has not pointed out and we are unable to perceive how such irregularities did or could prejudice the defendant or make the court's action arbitrary. As we have heretofore stated, one adjudged guilty of a criminal offense is not entitled to probation as a matter of right (*People* v. *Miller,* 317 Ill. 33,) and therefore, when the record discloses that the defendant was given the opportunity to present his application, when an investigation and report, deemed adequate by the trial judge to inform him of the circumstances he considers in exercising his discretion, has been made and considered, and defendant fails, as here, to show that he has been prejudiced in any manner, the exercise of the trial court's discretion in denying probation is not reviewable by this court.

We agree with the defendant's contention that the record in a probation hearing should be complete so as to show what was done at such hearing and the court here should have entered a formal order denying defendant's application. The entry of such order is indispensable when probation is granted in order for the court to retain jurisdiction, (*People* v. *Cahill,* 300 Ill. 279,) but where probation is not granted and the defendant is sentenced after a hearing on his application, the entry of a formal order denying his application for probation is not essential to the validity of the sentence. The exercise of the power to grant or deny probation should be in conformity with the statute, but informalities or irregularities which do not prejudice the defendant in any manner may be disregarded. C.J.S. vol. 24, page 179.

192

The defendant here had a fair hearing on his application for probation, the court effectively denied that application in the exercise of his discretion, and we cannot say that the court abused that discretion or acted in an arbitrary manner.

The judgment of the trial court is affirmed.

*Judgment affirmed.*